IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 14, 2015

## STATE OF TENNESSEE v. BRIAN ALLEN OSBORNE

**Appeal from the Criminal Court for Macon County**
**No. 2011-CR-185     David Earl Durham, Judge**

_____

**No. M2014-00352-CCA-R3-CD - Filed March 9, 2015**

_____

In October 2011, the Macon County Grand Jury indicted Brian Allen Osborne ("the Defendant") for aggravated arson, a Class A felony. Following a jury trial, the Defendant was convicted as charged and sentenced to 20 years in the Department of Correction. In this direct appeal, the Defendant contends: (1) the trial court erred by ruling that proffered testimony from a defense witness was inadmissible hearsay; (2) the trial court provided misleading and prejudicial jury instructions on the defense of intoxication; (3) the trial court erroneously instructed the jury that aggravated arson was both a result-of-conduct and nature-of-conduct offense; (4) the evidence was insufficient to sustain his conviction; and (5) the trial court erred in its application of enhancement and mitigating factors, resulting in an unjust and improper sentence. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

G. Jeff Cherry (at sentencing and on appeal), Comer L. Donnell, District Public Defender; Thomas H. Bilbrey and Joe McLerran (at trial), Assistant District Public Defenders, Lebanon, Tennessee; for the appellant, Brian Allen Osborne.

Herbert H. Slatery, III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Tom P. Thompson, District Attorney General; and Justin Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*State's Case-in-Chief*

This case stems from an early morning fire that was started on the back porch of the Defendant's neighbors' home on April 10, 2011. At trial, Danny Hall testified that he lived on Oak Knob Road in Macon County and the Defendant lived across the street. Mr. Hall was at home on the night of April 9, 2011, with his wife and adult son. Around 4:30 a.m. the following morning, Mr. Hall awoke to the sound of his dog barking. When he went into his living room, Mr. Hall saw the Defendant standing in the doorway of his screened-in back porch holding a gas can. The porch was on fire, and the Defendant was throwing gasoline onto the fire, making the flames worse. Mr. Hall quickly returned to his bedroom and told his wife that their house was on fire.

When they went outside to confront the Defendant, Mr. Hall saw that the Defendant had thrown the gas can onto the porch and the gas can had caught fire. The Defendant had a cane in his hand and was leaning against a post. The Defendant did nothing to stop the spread of the fire or attempt to put it out. When Mr. Hall asked the Defendant what he was doing, the Defendant calmly said that he wanted to talk to Jeffrey, Mr. Hall's son. Although the Defendant's voice was clear and understandable, Mr. Hall thought that there was something wrong with the Defendant because he was not acting like himself. The Defendant's eyes were "glassy looking," and he appeared to be holding himself up with the cane. Mr. Hall told the Defendant that he was not waking up Jeffrey, and he asked why the Defendant wanted to talk to Jeffrey. The Defendant said, "[Jeffrey] was riding the four wheeler up and down the road keeping me awake." When Mr. Hall refused to wake up his son, the Defendant "just turned around and walked off."

Mr. Hall removed the burning gas can from the porch and put it on the sidewalk. The porch fire eventually went out on its own, but the gas can continued to burn. When police arrived, they instructed Mr. Hall to pour water on the gas can to put out the fire. After the fire, Mr. Hall found a box of matches and a cigarette lighter on the back steps leading up to the screened-in porch, and he found a second cigarette lighter by the sidewalk in the back yard. Mr. Hall testified that he did not give the Defendant permission to come to his house and start a fire, and he knew of no one else who would have told the Defendant to do so.

Mr. Hall explained that the fire caused damage to the screened-in porch; it burned holes in the floor and blackened the ceiling, roof, and siding. Mr. Hall had to repaint everything on the porch and pressure wash the ceiling and siding. He also put down rugs to cover the holes that had been burned into the floor.

Priscilla Hall testified that she was in bed on the morning of the fire when her dog began barking around 4:30 a.m. Her husband got up and then returned to the bedroom, saying that their porch was on fire. When Mrs. Hall went outside, she saw the Defendant standing on the back porch. A gas can was on the porch, and the porch and gas can were both on fire. The Defendant's eyes were glazed over, and he was standing back from the flames. The Defendant repeatedly asked to see Jeffrey, but Mrs. Hall told the Defendant that she was not waking up her son. She said that, if he did not get off her porch, she was calling the police. When the Defendant did not move, Mrs. Hall called 911.

Mrs. Hall testified that she and her husband had lived in their house on Oak Knob Road for about six years. Up until that morning, they got along well with the Defendant, who lived across the street. Mrs. Hall testified that because she was inside the house calling police at the time, she did not know who took the gas can off the porch, but she believed that the Defendant had tried to get the gas can off of the porch with his cane.

Deputy Kevin Templeton, with the Macon County Sheriff's Department, testified that he responded to the Defendant's residence after Mrs. Hall's 911 call. Deputy Templeton stayed near the front of the Defendant's house while Deputy Kyle Petty approached an open door at the side of the house. When he heard Deputy Petty yelling at the Defendant, Deputy Templeton came back around the house and helped take the Defendant into custody. The Defendant "was covered in [] black soot from the fire." The Defendant was walking with a cane and appeared "disoriented" and "a little slow to react." Deputy Templeton testified, however, that it appeared that the Defendant knew what was going on and was able to comply with officers' commands. After placing the Defendant in a patrol car, Deputy Templeton noticed a truck sitting in the Defendant's driveway that had a siphoning hose hanging out of the gas tank. He also saw several gas cans and tools in the driveway and a box cutter near the front porch that appeared to have been used to cut the siphoning hose.

Deputy Kyle Petty, with the Macon County Sheriff's Department, testified that he arrested the Defendant at his residence on the morning of April 10, 2011. At the time of his arrest, the Defendant had black soot all over him. Deputy Petty also noticed that the Defendant was clammy and sweaty, which the deputy recognized as a possible indicator of methamphetamine use. When Deputy Petty entered the Defendant's house to clear it for safety purposes, he did not see any drugs in plain view.

At the victim's residence, Deputy Petty saw a burned area on the back porch, which he described as "four feet worth of charring about two feet wide," and a melted gas can on the sidewalk. Mr. Hall told Deputy Petty that the Defendant had attempted to pull the gas can off the porch with his cane after the Halls confronted him. Deputy Petty collected the

melted gas can, a box of kitchen matches, and two cigarette lighters from the scene. He then transported the Defendant to jail. The jail refused to admit the Defendant, however, until he was cleared medically so the Defendant was taken to the hospital.

Chris Sanders testified that, around 10:00 p.m. on April 9, 2010, he was "riding around by [himself] drinking" when he spotted a patrol car from the sheriff's department. Mr. Sanders, who admittedly was "well into a half a case of beer" and intoxicated, decided to stop at the Defendant's residence to avoid the officer. While outside the house, Mr. Sanders told the Defendant that he had just seen a patrol car and wanted to stay long enough for the officer to leave the area. When he was speaking to the Defendant, Mr. Sanders noticed that the Defendant seemed "off kilter" and was dressed only in his underwear.

After the two men went inside the Defendant's home, the Defendant asked Mr. Sanders why he had stopped at his house, and Mr. Sanders again told the Defendant that he had stopped because of the patrol car. Mr. Sanders testified that the Defendant was "very agitated" and was "intoxicated of sorts but not by alcohol." Mr. Sanders explained that, while he did not see the Defendant drinking alcohol that night, he saw the Defendant use methamphetamine. The Defendant had the methamphetamine on his kitchen table and "snorted it up his nose" while Mr. Sanders was inside the residence. Mr. Sanders identified the substance as methamphetamine based upon his familiarity and history with the drug. Because of the Defendant's agitated behavior, Mr. Sanders left the residence after about an hour.

The following day, Mr. Sanders heard from his boss that the Defendant had been arrested for setting fire to some property. Mr. Sanders told his boss and several other people that he had been at the Defendant's house the night before. He testified that he did not come forward to police because he had "no idea why the Defendant tried to burn the house." About six or seven months after the incident, however, Mr. Sanders learned that the Defendant was accusing him of putting something into the Defendant's drink the night before the fire. Mr. Sanders then contacted Deputy Petty and told the deputy that he did not give the Defendant any drugs.

On cross-examination, Mr. Sanders stated that he knew nothing about plant food or bath salts, and he firmly denied telling Amanda Osborne that he put anything in the Defendant's beer. Mr. Sanders testified that he did not talk to Ms. Osborne following the Defendant's arrest but that Ms. Osborne sent him a text message, asking what had happened the night of the fire. The following colloquy then took place:

Q:      Did you text her back and say, I put some plant food in [the Defendant's] beer?

A:    Never.

Q:    You didn't tell her that, I didn't think–I didn't want to hurt [the Defendant], but I put some plant food in his beer?

A:    Never happened.


      ***

 Q:    Did you ever communicate to her by text or any means whatsoever that you put something, plant food or something in [the Defendant's] beer?

A:    So help me by the grace of God, no.  That never happened.  Those words never left my mouth or texted by my fingers on the phone that that ever happened.  Why would I give that man anything?

*Jury-Out Hearings*

After the close of the State's case-in-chief, the Defendant made an offer of proof concerning the proposed testimony of his ex-wife, Amanda Osborne.  Ms. Osborne testified that she called Mr. Sanders after she learned that he had been at the Defendant's house the night before the fire.  During the phone call, Mr. Sanders allegedly told Ms. Osborne, "That they had put salt–some kind of rock salt or something in one of [the Defendant's] beers."  Mr. Sanders further said, "That he didn't mean to hurt [the Defendant] and he didn't realize that he would react that way" and that "apparently it caused [the Defendant] to go a little crazy."

The State objected to Ms. Osborne's testimony about Mr. Sanders' alleged statement on the basis of hearsay, but the Defendant argued that the testimony should be admitted for impeachment purposes as extrinsic evidence of a prior inconsistent statement under Rule 613. He asserted that the testimony "goes to [Mr. Sanders'] credibility."  The trial court sustained the State's objection, finding that there was no hearsay exception under which the statement could be admitted.  The trial court also determined that the statement was not admissible for impeachment purposes under Tennessee Rule of Evidence 613, stating, "It does not go to [Mr. Sanders'] credibility.  You're trying to get it in so you can use it to get in an expert witness.  That has nothing to do with credibility."  The trial court further stated that the Defendant was attempting to get Mr. Sanders' alleged statement "in the back door" and "use it as substantive evidence."

During a separate jury-out hearing, the Defendant called Dr. Greg Elam. Dr. Elam reviewed the Defendant's medical records from his visit to the emergency room on April 10, 2011. The Defendant was given a urine drug screen that showed the Defendant tested positive for amphetamine use. Dr. Elam contacted the manufacturer of the test kit and found out the sensitivity and specificity of the kit. He explained that, because of the sensitivity of the particular test used, it would "pick up either amphetamine salts which can be prescription or a street drug, or methamphetamine salt or a variety thereof." Dr. Elam testified that he was familiar with bath salts, which he described as synthetic amphetamines. He testified, however, that it was "unknown" whether the test that the Defendant was given would register amphetamine use based upon the Defendant's ingestion of bath salts. Dr. Elam stated:

> Most of the bath salts are so new that there hasn't been enough testing. In fact, they've not done specific testing. I talked to the company about this and they've not done specific testing with some of the more common bath salts.

Following this testimony, the trial court found that Dr. Elam's proposed testimony regarding bath salts did not satisfy the requirements for admission under Rule 702 of the Tennessee Rules of Evidence. The court found that testimony on the Defendant's possible ingestion of bath salts would be speculative as the doctor testified that there had not been sufficient testing on bath salts to reach any conclusions from the particular drug test in evidence. The trial court further ruled that the Defendant could not ask Dr. Elam about the behavior of people on bath salts until there was evidence presented that the Defendant had used bath salts.

*Defendant's Proof at Trial*

Amanda Osborne, the Defendant's ex-wife, testified that on April 9, 2011, the Defendant took her to work at the Hartsville Convalescent Center between 10:30 p.m. and 11:00 p.m. Ms. Osborne explained that, when he took her to work that night, the Defendant was fine. He spoke clearly and had no problems operating a car. While at work, Ms. Osborne and the Defendant communicated normally by text message until about 1:00 a.m. Ms. Osborne stated that, at that time, the Defendant "seemed fine." When she got off of work at 7:00 a.m the following morning, however, the Defendant was not there to pick her up. Ms. Osborne got a ride from a friend and went to the Defendant's residence. She saw that the Defendant's power tools were in the yard, which was unusual, and his truck had been left open. Ms. Osborne's SUV was sitting in the yard with the engine running. Ms. Osborne testified that she never saw the Defendant use illegal drugs when they lived together.

Jennifer McGuffey, an LPN working at the Macon County jail, testified that on the morning of April 10, 2011, Sergeant Sharon Rackey called her at home. Sergeant Rackey

informed Ms. McGuffey that there was an individual at the jail who "wasn't acting right" and was possibly under the influence of an intoxicant. When Ms. McGuffey responded to the jail around 6:30 a.m., she saw the Defendant, whom she knew, sitting on a bench in the booking room. The Defendant was sweating and appeared to be hot. The Defendant's mouth was dry, and he had a white film covering his tongue. The Defendant acted scared and appeared to be hallucinating. At one point, he told Ms. McGuffey, "[C]ome on, Jennifer, we gotta get out of here." Based upon her examination, Ms. McGuffey determined that the Defendant was under the influence and sent him to Macon County General Hospital for medical clearance. After the Defendant returned to the jail around 8:45 a.m., Ms. McGuffey received a discharge report from the hospital, indicating that the Defendant's urine screen was positive for amphetamine use. The report stated that the Defendant had been angry while answering questions posed by hospital staff but he acted appropriately otherwise.

Michael Duffer, a corrections officer with the Macon County Sheriff's Department, testified that he was working at the jail when the Defendant was brought in on the morning of April 10, 2011. Deputy Duffer recalled that the Defendant smelled of alcohol and smoke and the Defendant's clothes had ash on them. The Defendant could not stand on his own and seemed disoriented. The Defendant did not know who he was or where he was, and he did not recognize Deputy Duffer, despite the fact that they had known each other for 15 years. Deputy Duffer testified that the Defendant continued to seem disoriented for several days after his arrest.

Deputy Scotty Sutton testified that he was on duty at the Macon County jail when the Defendant was brought in. Because it appeared that the Defendant was "under the influence of something" and "pretty intoxicated," Deputy Sutton and another officer helped the Defendant out of Deputy Petty's patrol car and brought him into the booking area. Deputy Sutton testified that, once inside the booking area, the Defendant seemed to be hallucinating. The Defendant asked to speak to Deputy Ethridge, but he was told that Deputy Ethridge did not work on weekends. The Defendant then insisted that he had just talked to Deputy Ethridge in the basement of the jail even though the jail had no basement. Deputy Sutton testified that it took several days before the Defendant could speak with clarity.

Melissa Smith, an office manager and nurse at Dr. Bowden Smith's office in Carthage, Tennessee, testified that Dr. Smith began treating the Defendant in 2009. Ms. Smith explained that the Defendant was drug tested once a month in order to ensure that the Defendant was taking his medications as directed. The Defendant took a drug test on March 21, 2011, and the test did not indicate positive for amphetamine use.

Dr. Greg Elam testified that he had reviewed the medical records from the Defendant's emergency room visit the day of his arrest. Dr. Elam explained that the

Defendant was given a urine test to screen for drugs and, according to the drug screen, the Defendant tested positive for amphetamines. Dr. Elam explained that the "amphetamines" result would include both amphetamine and methamphetamine because the particular test used by the hospital was designed to pick up both amphetamine and methamphetamine use.

Dr. Elam noted several clinical indicators that the Defendant had amphetamine or methamphetamine in his system the morning of his arrest. The Defendant was uncooperative and angry. His blood pressure was up, his pulse rate was irregular, and his potassium was low. Dr. Elam explained that these findings were consistent with someone being treated for stimulant abuse. Regarding the effects of amphetamine and methamphetamine on individuals, Dr. Elam testified that the drugs caused feelings of excitement, euphoria, omnipotence, and power. At higher doses, an individual could experience hallucinations, delusions or extreme paranoia and turn aggressive or violent.

On cross-examination, Dr. Elam testified that the Defendant's behavior at the jail was consistent with use of amphetamine or methamphetamine and that the lab report findings were consistent with the Defendant's having snorted methamphetamine the night before. He stated that methamphetamine could make an individual more angry and upset about things but would not prevent an individual from doing simple tasks. Dr. Elam agreed that methamphetamine use would not prevent someone from starting a fire if he or she wanted to do so.

Based upon the evidence presented, the jury found the Defendant guilty of aggravated arson.

*Sentencing Hearing*

At the Defendant's subsequent sentencing hearing, Robert Jackson testified that he had prepared the Defendant's presentence report. In his investigation, Mr. Jackson found that the Defendant was 34 years old and a high school graduate, and the Defendant had a prior history of criminal convictions dating back to 1997. Specifically, the Defendant was convicted in Tennessee of three counts of driving on a revoked license; driving while impaired; two counts of public intoxication; two counts of reckless endangerment with a deadly weapon; and three counts of driving under the influence of an intoxicant. The Defendant was also convicted of receiving stolen property and criminal conspiracy in Pennsylvania in 1997. In speaking with authorities in Pennsylvania, Mr. Jackson learned that the Defendant had received a three-year suspended sentence but the Defendant never reported to probation. He absconded and his file was eventually closed. Regarding the Defendant's history on probation in Tennessee, Mr. Jackson testified that the Defendant had violated probation on several occasions.

Mr. Jackson received victim impact statements from the Halls, which he included in the report. Mr. and Mrs. Hall reported that the porch to their home had to be painted and the porch and porch ceiling had to be pressure washed to remove soot and smoke damage from the fire. Mr. Jackson noted that the Halls did not itemize the costs associate with the repair but "they both indicated that the Defendant should have to pay for their loss."

In an allocution statement, the Defendant apologized to the victims. He stated that he "was not [himself] that night" and that he did not remember the events surrounding the offense. The Defendant explained that, years before, he fell from a bridge and almost died. He stated that, as a result of the accident, he suffers daily from pain in his hip and back and must use a cane or wheelchair to assist in his mobility. The Defendant asked the court to impose the minimum sentence in his range.

In sentencing the Defendant, the trial court found that the Defendant was a standard Range I offender with a sentence range of 15 to 25 years. Based upon his conviction for aggravated arson, the Defendant was required to serve 100% of the sentence imposed. Before setting the length of the Defendant's sentence, the trial court considered mitigating and enhancement factors.

Regarding enhancement factors, the trial court considered enhancement factor (1) and found that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. The court noted that the Defendant had multiple prior felony and misdemeanor convictions and four prior probation violations. The court found that the Defendant's prior record "takes him out of the minimum [in the] range."

The trial court also considered enhancement factors (3) and (8) that the offense involved more than one victim and that the Defendant, before trial or sentencing, had failed to comply with the conditions of a sentence involving release into the community. The court stated, "We've got four probation violations in Tennessee. He's still on absconder status from Pennsylvania where he never even reported to his PO's office." The trial court also considered enhancement factor (13) that, at the time the felony was committed, the Defendant was on release from a prior felony conviction. Regarding this factor, the court stated, "[H]e never showed up for probation in Pennsylvania. Or we can look at (h), on escape status. Well, in Tennessee, if you don't show up for probation, you're on escape status, so Number 13 applies." Based upon these considerations, the trial court imposed a sentence of 20 years.

This timely appeal followed.

## Analysis

*I. Ms. Osborne's Proffered Testimony*

A. Hearsay

On appeal, the Defendant contends that the trial court erred when it concluded that Ms. Osborne's proffered testimony was inadmissible hearsay. According to the Defendant, Ms. Osborne's testimony–that Mr. Sanders told her that "he didn't mean to hurt [the Defendant] and he didn't realize that he would react that way"–is not hearsay because it was not offered to prove the truth of the matter asserted. The Defendant contends that he offered the statement only to prove that Mr. Sanders made the statement and the statement is circumstantial evidence that Mr. Sanders did something to cause the Defendant to react adversely. He further argues that, if Ms. Osborne's testimony had been admitted as such, the proffered testimony from Dr. Elam regarding synthetic amphetamines would have been relevant and admissible.

We first note that, at trial, the Defendant argued that Ms. Osborne's testimony regarding Mr. Sanders' statement was admissible under Tennessee Rule of Evidence 613(b) for impeachment purposes, asserting that the testimony went to Mr. Sanders' credibility. In his motion for new trial, the Defendant abandoned this argument in favor of the hearsay argument presented on appeal. However, in a motion for new trial and on appeal, a party is bound by the basis for admissibility it asserted when the proof was offered at trial. See Tenn. R. Evid. 103(a)(2) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."); State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990) (stating that "an accused may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis" on appeal)). We find that the Defendant's argument on appeal–that Mr. Sanders' statement is not hearsay because it was not offered for its truth but as circumstantial evidence that Mr. Sanders did something to cause the Defendant to react adversely–is waived because the Defendant failed to make this argument at trial.

Waiver notwithstanding, the Defendant's argument is without merit. Our supreme court recently explained that the appellate standard of review for rulings on hearsay evidence has multiple layers:

Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the

-10-

hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d at 759-61. Once the trial court has made its factual findings, the next questions — whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule — are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Edward Thomas Kendrick, III v. State, No. E2011-02367-SC-R11-PC, 2015 WL 240484, at *23 (Tenn. Jan. 16, 2015).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is an oral or written assertion. Tenn. R. Evid. 801(a). In order to be an assertion, an utterance must "be offered with the intent to state that some factual proposition is true." State v. Land, 34 S.W.3d 516, 526 (Tenn. Crim. App. 2000). Generally, hearsay is inadmissible unless the statement falls under one of the exceptions to the hearsay rule. See Tenn. R. Evid. 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing Mays v. State, 495 S.W.2d 833 (Tenn. Crim. App. 1972) and Johnson v. State, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

In this case, the Defendant acknowledges that he offered Mr. Sanders' statement that "he didn't mean to hurt [the Defendant] and he didn't realize that he would react that way" to prove that Mr. Sanders did something to cause the Defendant to react adversely. The Defendant contends, however, that the statement is not hearsay because the matter asserted by the statement is merely that Mr. Sanders was remorseful. We disagree. The statement asserts not only remorse but substantive evidence of guilt on the part of Mr. Sanders for being the ultimate cause of the Defendant's behavior. The context of the Defendant's offer of proof confirms that such assertion was contained within Mr. Sanders' statement. As noted previously, during a jury-out hearing, Ms. Osborne testified that, during a phone call to Mr. Sanders after the fire, Mr. Sanders told her that "they had put salt–some kind of rock salt or something in one of [the Defendant's] beers"; "he didn't mean to hurt [the Defendant] and he didn't realize that he would react that way"; and "apparently it caused [the Defendant] to go a little crazy." During his argument to the trial court, the Defendant made no distinction between the three statements in arguing that the statements should be admitted.

Because the Defendant offered the statement for the truth of the matter asserted, the trial court properly determined that the statement was hearsay and that no exception to the hearsay rule allowed for the admission of the statement.[1]

### B. Rule 613(b)

Alternatively, the Defendant argues that the trial court should have admitted Ms. Osborne's testimony under Rule 613(b) of the Tennessee Rules of Evidence as extrinsic evidence of a prior inconsistent statement by Mr. Sanders. The State maintains that any error is harmless.

Tennessee Rule of Evidence 613(b) allows for the introduction of otherwise inadmissible extrinsic evidence for impeachment purposes. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). The rule states that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b) (2013). The Advisory Commission Comments to Rule 613(b) clarify that the "only requirement" for the use of extrinsic evidence is that the witness must be "afforded an opportunity to explain or deny."[2] Extrinsic evidence may only be offered if the witness denied making the earlier statement. State v. Ackerman, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012). The extrinsic evidence may be "the written or recorded content of the prior statement itself or the testimony of another witness as to the content of the prior written or oral statement." Neil Cohen et al., Tennessee Law of Evidence, § 613.4 (4th ed. 2003).

However, when a prior inconsistent statement is introduced for impeachment purposes, it may be considered only on the issue of credibility and not as substantive evidence. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) (quoting Jones v. Lenoir City Car Works, 392 S.W.2d 671, 673 (Tenn.1965)); State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1991). Following a timely objection, a trial court should exclude a prior inconsistent statement when it is offered as substantive evidence of guilt or innocence, and upon request, the court should instruct the jury that the prior statement may only be considered to determine the credibility of the witness. Smith, 24 S.W.3d at 279; see also

---

[1] On appeal, the Defendant makes no argument that the statement meets a recognized exception to the hearsay rule.

[2] An additional limitation to the rule is that extrinsic evidence may not be used where the trial court determines that the evidence concerns a collateral matter. State v. Reid, 164 S.W.3d 286, 314 n. 9 (Tenn. 2005) (citing Neil P. Cohen et al., Tennessee Law of Evidence, § 613.5 (4th ed. 2003)).

Tenn. R. Evid. 105 (stating that "when evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly").

Evidentiary determinations rest in the sound discretion of the trial court. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997). Moreover, any error in excluding evidence under Rule 613 is subject to harmless error analysis. State v. Reid, 164 S.W.3d. 286, 314 (Tenn. 2005); Martin, 964 S.W.2d at 568. A judgment shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process. See Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008).

In this case, the Defendant clearly satisfied the prerequisites of Rule 613(b). The Defendant gave Mr. Sanders the opportunity to explain or deny the inconsistent statement during cross-examination, and Mr. Sanders denied making the statement to Ms. Osborne. The State also had an opportunity to question Mr. Sanders further. The statement does not relate to a collateral matter, and it is clearly inconsistent with Mr. Sanders' trial testimony. Because the prior inconsistent statement could be considered as proof of Mr. Sanders' lack of credibility, the trial court should have admitted the statement under Rule 613(b).

Nevertheless, we agree with the State that the error is harmless. Ms. Osborne's testimony regarding Mr. Sanders' prior inconsistent statement would have been admissible only for the purposes of impeaching his credibility.[3] The statement would not have been admissible as substantive evidence to show that Mr. Sanders acted in any particular manner or that he caused the Defendant to behave erratically. Moreover, when limited to the purpose of impeaching Mr. Sanders' credibility, Ms. Osborne's testimony would not have established the defense of involuntary intoxication nor would it have provided an evidentiary basis for the proposed testimony of Dr. Elam. Under these circumstances, we find that the error is harmless, and the Defendant is not entitled to relief.

*II. Jury Instructions*

A. Intoxication Defense

The Defendant next contends that the trial court erred by giving misleading and prejudicial jury instructions on the issue of intoxication and by failing to clarify those instructions after a question from the jury during deliberations. The State argues that the

---

[3] Clearly, based upon the State's hearsay objection, the jury would have been instructed that the admission of Mr. Sanders' prior inconsistent statement could be considered as proof of his lack of credibility but not as substantive evidence. See Smith, 24 S.W.3d at 279.

Defendant has waived consideration of this issue by failing to object to the trial court's jury instructions and its response to the jury question.

This Court has previously stated that "[i]f a jury instruction is erroneous or the trial judge fails to give a requested instruction, a defendant has two options. He can call it to the trial judge's attention immediately or he can sit on his objection and allege it as a ground in support of his motion for a new trial." State v. Haynes, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986) (citing Tenn. R. Crim. P. 30(b)). Alleged omissions in the charge, however, must be called to the trial court's attention at trial or be regarded as waived. Id. Because the Defendant asserts that the trial court's instructions were erroneous and because he raised the issue in his motion for new trial, we will address the issue on the merits.

At trial, the court instructed the jury as follows:

Included in the Defendant's plea of not guilty is his plea of intoxication as a defense.

You have heard evidence concerning the alleged intoxication of the Defendant at the time of the alleged offense.

Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and, while in that condition, commits an act which would be a crime if he or she were sober, he or she is fully responsible for his or her conduct. It is the duty of persons to refrain from placing themselves in a condition which poses a danger to others.

However, involuntary intoxication is a defense to prosecution if as a result of the involuntary intoxication the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated.

"Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

"Involuntary intoxication" means intoxication that is not voluntary.

"Voluntary intoxication" means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known.

-14-

If evidence is introduced supporting the defense of involuntary intoxication, the burden is on the state to prove beyond a reasonable doubt that the Defendant was not involuntarily intoxicated.

If from all the facts and circumstances you find the Defendant was involuntarily intoxicated, or if you have a reasonable doubt as to whether the Defendant was involuntarily intoxicated, you must find him not guilty.

Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the Defendant's culpable mental state.

In this case, the state must prove beyond a reasonable doubt the required mental state of the Defendant which has been heretofore set out under the elements of Aggravated Arson or Arson or Reckless Burning.

If you find that the Defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged.

If you are not satisfied beyond a reasonable doubt that the Defendant possessed the culpable mental state then you must find him not guilty.

If recklessness establishes an element of the offense, to wit: Reckless Burning, and the Defendant is unaware of a risk because of voluntary intoxication, the Defendant's unawareness is immaterial and is no defense to that element in the prosecution of said offense.

During deliberations, the jury presented a question to the trial court regarding the instructions on intoxication. The court then addressed the matter on the record:

I've been handed a slip of paper. It refers to Page 16, Paragraph 3. Intoxication itself is not a defense, in quotations. Page 17, if you find the Defendant is intoxicated to the extent that he could not have possessed the [required] culpable mental state [] -. We feel these two paragraphs are contradictory to each other. Please clarify.

Following a discussion with the parties on the proper response, the trial court responded to the jury's inquiry with the following instruction:

-15-

These instructions, and I do realize, maybe they would seem rather confusing, but the instructions I've given you are the instructions which have been developed according to the law and the statutes, and even though they may seem contradictory, they're really not, okay.

Now, I cannot explain for you the confusion you may have because if I were to do that, it may give you some indication as to what I think your verdict should be, and I cannot do that. The only thing I can ask you to do is just go back there and work a little harder, okay.

I understand on first appearance some of these rules may seem confusing, but you all don't do this every day like we do, but they're really not, okay. They are different. That's why they're in there the[] way they are. The best I can do is just say, take them back in there again. Review them again. Take your time. Take a deep breath. Nobody is in any big hurry, and I think if you'll do that, you'll be able to resolve what you think may be a contradiction or conflict. I'm confident you'll be able to. Just spend a little time on it . . . .

Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)); see also Tenn. R. Crim. P. 30(d)(2). A charge "should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (citations omitted). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. See State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).

In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). The United States Supreme Court has observed that in evaluating claims of error in jury instructions, courts must remember that

jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Boyde v. California, 494 U.S. 370, 380-81 (1990). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is *de novo* with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

Contrary to the Defendant's position, the trial court's instruction on the defense of intoxication was a proper statement of the law. The instruction tracks the language of the relevant statute, see Tenn. Code Ann. § 39-11-503, and it follows the pattern jury instruction, as provided in the Tennessee Pattern Jury Instructions. See T.P.I. Crim. 40.02 (18th ed. 2014). On appeal, the Defendant has failed to identify the error in the trial court's instruction or suggest what "further guidance" the trial court should have given the jury. We conclude that the trial court's jury instruction fairly submitted the legal issues and did not mislead the jury as to the applicable law. This issue is without merit.

### B. Definition of "Knowingly"

In this case, the trial court defined the *mens rea* element of aggravated arson in terms of the nature of the Defendant's conduct, the circumstances surrounding the Defendant's conduct, and the result of the Defendant's conduct. Specifically, the court instructed:

> **"Knowingly"** means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The Defendant argues that the trial court committed reversible error by failing to limit the definition of "knowingly" to the nature-of-conduct language. Although we conclude that the trial court erred, we determine that the error is harmless.

As relevant to this case, a person commits aggravated arson when he "knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein," and "[w]hen one (1) or more persons are present therein[.]" Tenn. Code Ann. §§ 39-14-301 (a)(1), -302(a)(1) (2011). The offense requires that an act to be done "knowingly," which can refer to all three conduct elements: (1) nature of conduct, (2) circumstances surrounding conduct, and (3) result of conduct. See Tenn. Code Ann. § 39-11-302(b) (2011) ("'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.").

-17-

In State v. Gene Shelton Rucker, Jr., No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004), perm. app. denied (Tenn. Mar. 21, 2005), this Court determined that aggravated arson is not a result-of-conduct offense. In other words, aggravated arson does not "require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure." Id. Rather, "the nature of the conduct–creating a fire or explosion–that causes the damage to the structure is consequential and central to the offense." Id. Thus, the knowing *mens rea* for aggravated arson is satisfied where "the person is aware of the nature of the conduct" or the accompanying circumstances. See id.; Tenn. Code Ann. § 39-11-302(b) (2011).

In criminal cases, a defendant has a right to a correct and complete charge of the law. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). The material elements of each offense should be described and defined in connection with that offense. See State v. Ducker, 27 S.W.3d 889, 899 (Tenn. 2000); State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. Garrison, 40 S.W.3d at 433-34.

In State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), this Court held that the trial court gave an erroneous instruction which defined the entire scope of the "knowing" culpable mental state when only the result of conduct definition applied. Page, 81 S.W.3d at 788-89. This Court reasoned that a "jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof." Id. This Court further concluded the error was not harmless beyond a reasonable doubt because the defendant's culpable mental state was a disputed issue at trial. Id. at 789-90.

However, in State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005) our supreme court restricted the holding in Page, by concluding that the superfluous conduct language in the "knowingly" definition "did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly." Id. at 59; see also Vaughn v. State, 202 S.W.3d 106, 122 (Tenn. 2006); State v. Frederick Leon Tucker, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *13 (Tenn. Crim. App. Mar. 7, 2006). Additionally, the supreme court was not convinced "that the inclusion of such language is an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition." Faulkner, 154 S.W.3d at 58-59. The court concluded that the error did not qualify as a misstatement of a material element of the offense, as suggested by Page; but rather, the error was harmless. Id. at 60.

Turning to the instant case, the trial court did not instruct the jury that they had to find that the Defendant acting knowingly as to either the nature of his conduct **or** the result of his conduct. Instead, the trial court's instruction implies that, for a jury to find that the Defendant acted knowingly, the jury must find that the Defendant was (1) aware of his conduct or aware of the circumstances **and** (2) aware that the conduct was reasonably certain to cause a certain result as to each material element of the offense. This instruction did not relieve the State's burden of proving every element of the offense beyond a reasonable doubt. Rather, the instruction on "knowingly" provided by the trial court supplied a two-prong definition of the term, resulting in an added burden of proof upon the State. See State v. Jennie Bain Ducker, No. 01C01-9704-CC-00143, 1999 WL 160981, at *16-18 (Tenn. Crim. App. Mar. 25, 1999), aff'd on other grounds 27 S.W.3d 889 (Tenn. 2000). Although the trial court's instruction was erroneous because it did not charge the specific *mens rea* definition applicable to the conduct element of aggravated arson, we conclude that any such error is harmless. Tenn. R. App. P. 36(a).

## IV. *Sufficiency of the Evidence*

The Defendant argues that the evidence presented at trial was insufficient to sustain his conviction for aggravated arson. He claims the State failed to prove that (1) he acted without the consent of all persons who had an interest in the structure and (2) that he knowingly started the fire. The State maintains that the evidence is sufficient. We agree with the State.

Our standard of review for a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431 (Tenn. 1995). This Court will not reweigh the evidence. Id.

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). On review the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

For purposes of this case, a person commits aggravated arson when he "knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein," and "[w]hen one (1) or more persons are present therein[.]" Tenn. Code Ann. §§ 39-14-301 (a)(1), -302(a)(1) (2011). There is no requirement that the person or persons present be injured or that the property actually be destroyed. State v. Lewis, 44 S.W.3d 501, 508 (Tenn. 2001). As noted previously, the knowing *mens rea* of aggravated arson is satisfied when the person is aware of the nature of the conduct or the accompanying circumstances. See Tenn. Code Ann. 39-11-302(b) (2011); Gene Shelton Rucker, 2004 WL 2827004, at *10. As to the consent element, this Court has previously held that the State is "required to prove that only one person with a possessory interest in the property did not consent to burning it." State v. Michael Aaron Jenkins and Perley Winkler, Jr., No. E2008-02321-CCA-R3-CD, 2011 WL 578593, at *8 (Tenn. Crim. App. Feb. 17, 2011), perm. to app. denied (Tenn. May 25, 2011). Logically, if one person does not give consent, then a defendant does not have the consent of "all persons" who had a possessory interest in the property. Id.

In this case, the proof at trial overwhelming established that the Defendant started a fire on the screened-in porch of the victims' home while they were asleep inside and that the fire damaged the porch. However, the Defendant argues that the State failed to prove that he acted without the consent of all persons with an interest in the structure because Mr. Hall was the only person who testified that he did not give the Defendant permission to start the fire and Mr. Hall "did not know if anyone else gave verbal permission to the [Defendant] to do so." However, the State was only required to prove that one person with a possessory interest in the property did not consent to burning it. See Michael Aaron Jenkins and Perley Winkler, Jr., 2011 WL 578593, at *8. Therefore, even if the only proof in the record on this issue was Mr. Hall's testimony that he did not give consent, his testimony alone would have satisfied that element of the crime.

The Defendant also argues that the State failed to prove that he acted knowingly. He asserts that ample evidence of his intoxication was offered at trial and that his intoxication was such that it "clearly diminished any awareness he had of his conduct." Although voluntary intoxication is not a complete defense to prosecution for a crime, such evidence is admissible to negate a culpable mental state. See Tenn. Code Ann. § 39-11-503(a) (2011); State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000). The weight placed on such evidence and "the determination of whether the voluntary intoxication negated the culpable mental elements" are issues for the jury to resolve. Morris, 24 S.W.3d at 796.

In this case, the trial court properly instructed the jury on the defense of intoxication, and the jury was presented with testimony regarding the Defendant's amphetamine use and his subsequent uncharacteristic appearance and behavior. By its guilty verdict, however, the

jury found that the defendant acted knowingly when he committed the crime and that his voluntary intoxication did not negate the culpable mental state. Because we will not second-guess the jury's determination, the Defendant is not entitled to relief on this basis. Therefore, we find that there was sufficient evidence to support the Defendant's conviction beyond a reasonable doubt.

*V. Sentencing*

The Defendant also contends that the trial court erroneously applied two enhancement factors and disregarded an important mitigating factor, resulting in an unjust and improper 20-year sentence.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. Id. at 554-55; State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978); State v. Delp, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. Bise, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this Court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401 (2013), Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn.

Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2013).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2013).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are merely advisory. See Tenn. Code Ann. § 40-35-114 (2013); see also Bise, 380 S.W.3d at 699 n. 33, 704; Carter, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

In this case, the trial court imposed a sentence within the appropriate range, see Tenn. Code Ann. § 40-35-112(a)(1), and the sentence reflects a proper application of the purposes and principles of sentencing. Thus, we review the trial court's sentence for an abuse of discretion with a presumption of reasonableness. See Bise, 380 S.W.3d at 707.

The Defendant first argues that the trial court erred in refusing to consider the mitigating factor that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law

motivated the criminal conduct." See Tenn. Code Ann. § 40-35-113(11) (2013). However, the record shows that the trial court did consider this mitigating factor. In sentencing the Defendant, the trial court stated:

> [T]he Court seems to recall there was some information about [the Defendant's] physical condition at the time of the offense, that he might have been under some type of–under the influence of some type of intoxicant.
>
> Well, that was specifically rejected by the jury in this particular case, specifically rejected by the jury. But giving the Defendant the benefit of the doubt, [mitigating factor] Number 11 may or may not apply. I don't really think it makes a lot of difference in this case . . . when you look at the enhancement factors . . . .

 In other words, the trial court recognized the mitigating factor but gave it no weight, as the court was entitled to do. See Carter, 254 S.W.3d at 345.

Regarding enhancement factors, the Defendant contends that the trial court misapplied the "multiple victim" enhancement factor. See Tenn. Code Ann. § 40-35-114(3) (2013). Tennessee courts have recognized that a person or entity is a "victim" under Tennessee Code Annotated section 40-35-114(3) when that person or entity "is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). Additionally, our supreme court has stated that the use of the "multiple victim" enhancement factor is "well-suited to the aggravated arson statute, which does not permit multiple convictions in spite of the fact that multiple persons were victimized by the fire." State v. Lewis, 44 S.W.3d 501, 508 (Tenn. 2001). In this case, the evidence established that both Mr. and Mrs. Hall had property destroyed in the fire. In victim impact statements provided to the court, both Mr. and Mrs. Hall listed damages to their porch and house as a result of the Defendant's actions. This evidence was sufficient to support this enhancement factor.

The Defendant also challenges the trial court's consideration of enhancement factor (13), which states:

> At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:
>
> (A) Released on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony;

(B) Released on parole;

(C) Released on probation;

(D) On work release;

(E) On community corrections;

(F) On some form of judicially ordered release;

(G) On any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government;

(H) On escape status; or

(I) Incarcerated in any penal institution on a misdemeanor or felony charge or a misdemeanor or felony conviction[.]

Tenn. Code Ann. § 40-35-114(13) (2013).

In applying this factor, the trial court stated, "[H]e never showed up for probation in Pennsylvania. Or we can look at (h), on escape status. Well, in Tennessee, if you don't show up for probation, you're on escape status, so Number 13 applies." It is not clear from the record if the Defendant would be considered as "on escape status" in Pennsylvania for absconding. Nevertheless, we agree with the State that the Defendant's absconding from the Pennsylvania court system was properly considered by the trial court as a failure of the Defendant to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(8) (2013). Thus, even if the trial court had misapplied enhancement factor (13), several other enhancement factors were clearly established by the evidence. See Tenn. Code Ann. §§ 40-35-114(1), (3), (8). Thus, we affirm the Defendant's sentence because the trial court relied on other reasons consistent with the purposes and principles of sentencing. Bise, 380 S.W.3d at 706. The Defendant is not entitled to relief.

## Conclusion

For the aforementioned reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE